Joseph V. **BICKAR**, Petitioner,

v.

Frank H. **GRAY**, Superintendent, Chillicothe Correctional Institution, Respondent.

Civ. A. No. C 73–993 Y.

United States District Court,
N. D. Ohio, E. D.

July 26, 1974.

Thomas C. Simiele, Rocky River, Ohio, for petitioner.

Leo J. Conway, Asst. Atty. Gen., Donald Billman, Asst. Atty. Gen., Crim. Activities Div., Columbus, Ohio, for respondent.

## ORDER

CONTIE, District Judge.

This matter came on for an oral evidentiary hearing before the Court May 6, 1974, on petitioner's application for a Writ of Habeas Corpus filed pursuant to Title 28, U.S.C. § 2254. Upon consideration and for the reasons stated below, petitioner's request for said Writ shall be denied.

The petitioner was found guilty of one count of larceny by trick and one count of possession of an operable firearm by a convicted felon. He was sentenced to serve an indeterminate term of from one to seven years on the larceny by trick charge and an indeterminate term of from one to five years on the possession of firearms by a convicted felon charge, said sentences to run consecutively.

This Court has previously ruled that petitioner has exhausted his available state remedies and that he has alleged a violation of a cognizable federally protected right which can be raised by a petition of Habeas Corpus, thus this matter is properly before the Court.

The Court finds the facts leading up to petitioner's arrest and subsequent conviction as follows:

On January 19, 1972, the petitioner was contacted by David Liberti, an undercover agent of the Stark Metropolitan Narcotics squad posing as a "hippie" from Florida attempting to purchase narcotics. A meeting was arranged between petitioner and agent Liberti for Friday, January 21, 1972. Agent Liberti accompanied by George Preston, an undercover federal narcotics agent, met petitioner January 21 and turned over $800.00 of marked money to petitioner. In return they were informed where they could pick up the packets supposedly containing dilaudid. The agents found the packets, but, when they had the substance analyzed, they found it to be saccharine.

Petitioner informed several people of what he had done to the "hippies".

Upon learning of the composition of their purchase, the agents went to petitioner's house but petitioner was not in and his wife would not answer the door.

On Monday, January 24, 1972, the two agents still disguised as Florida "hippies" went to petitioner's house. Petitioner recognized the car driven by the agents and met them at the door carrying a pistol. He showed the gun to the "hippies". After some conversation, petitioner allowed Agent Preston to come into his house to discuss the original transaction. At this point petitioner still believed that the agents were hippies.

The discussion lasted about twenty minutes culminating in Agent Preston informing plaintiff that he was a Federal Agent. At this time petitioner allowed Agent Liberti into the house.

At the time Agent Liberti came into the house, petitioner had the gun in his belt where he had put it after Agent Preston requested that he put the gun down. Some time later while still in the presence and in the plain view of the

agents, petitioner put the gun on a refrigerator next to another gun which also was in plain view of the agents.

After Agent Liberti entered the house, petitioner stated that he no longer had the money.

Petitioner next attempted to deceive the agents into believing that he too was a Federal undercover agent. A call was placed by the petitioner to William Deckard, Chief of the Secret Service in Cleveland. Mr. Deckard was reported to be out of town for several days. Petitioner requested that Mr. Deckard be asked to return his call.

Petitioner admits that he was not connected with the Secret Service.

After the phone conversation the Agents went to the Office of the Stark County Prosecutor where they obtained a warrant for petitioner's arrest. When they returned accompanied by Sheriff's deputies to execute the warrant, petitioner was not at home. While petitioner was being sought, a search warrant was obtained authorizing a search of petitioner's house for United States currency bearing specific serial numbers, i. e. those bills used by the agents to purchase the phony dilaudid. The search warrant also authorized a search for illegally possessed hand guns, rifles and automatic weapons. The information used to gain the warrant to search for the guns was based upon the observations made by the two agents earlier in the day.

Petitioner was subsequently arrested and was present at the house when the search was conducted. Several weapons were seized at this time. At least one of these was later used as evidence at petitioner's trial.

Petitioner claims that the agents violated his Fourth Amendment rights by conducting an unlawful warrantless search in the morning, thus the later search warrant was invalid making the subsequent search and seizures unlawful.

For the following reasons this Court rejects this contention.

■ The petitioner himself admits that he came to the door carrying a pistol and that he voluntarily showed the gun to the "hippies". At this point no entry was even made. There were no signs warning the agents to stay away from the petitioner's porch and it was open for the use of tradesmen; thus it cannot be said that the agents were not entitled to go to the door and knock. Since the agents were rightfully in a position to view the gun in the hand of the petitioner, they had a right to use this knowledge as a basis for issuing the search warrant. See United States v. Cecil, 457 F.2d 1178 (C.A. 8 1972); Ellison v. United States, 206 F.2d 476, 93 U.S.App.D.C. 1 (1953).

This Court is of the opinion that this case is governed by the rulings of the Supreme Court in the cases of Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) and Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966). In those two cases statements were intentionally made to or in the presence of persons who were not known to be agents of the government. The Supreme Court in both of these cases allowed the convictions, based on said statements, to stand. This Court concludes that the mere fact that petitioner was not aware that the two men were undercover agents does not negate or invalidate said agents' observations as to the weapon carried by the petitioner.

■ This Court further is of the opinion that Agent Preston's entry into petitioner's home was not illegal and that all information concerning petitioner's possession of firearms which he gained from his observations in the house is valid.

This Court again would liken this situation to that in *Hoffa* and *Osborn* where the informants gained entrance to the quarters of the persons in question therein by concealing their intentions and purposes. The fact that in the *Hoffa* and *Osborn* cases the informers were known to the persons involved and that

they had had previous dealings with them (while in the instant case petitioner did not know or deal with the agents except on the two previous occasions) is deemed by this Court to be a distinction without merit.

Both sides cite the case of Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966) in support of their positions. In the *Lewis* case, an undercover narcotics agent entered Lewis' home for the purpose of buying narcotics. He purchased the narcotics which were later used as evidence in the narcotics trial against him.

The Supreme Court upheld the entry of the agent. While the concurring opinion of Mr. Justice Brennan in which Mr. Justice Fortas joined makes it clear that said Justices believed that the controlling factor was that Mr. Lewis gave up his right to privacy by conducting an illegal narcotics business in his home, the majority opinion is not so limiting.

Another case relied upon heavily by the petitioner is Fraternal Order of Eagles No. 778 v. United States, 57 F.2d 93, where the Fifth Circuit Court of Appeals held that where two prohibition agents entered a lodge hall for the purpose of obtaining information as to potential violations of the liquor law, and posed as members of a distant lodge, which they were not, a search based upon these observations was unlawful as stemming from an illegal search.

The instant case is distinguishable from the *Eagles* case in that the agents in this case did not go to petitioner's house for the purpose of conducting a surreptitious search. The agents instead were there to obtain the return of the money petitioner obtained from them by trickery. While Agent Preston's true identify was unknown to petitioner, his purpose was clearly known.

The third case relied upon by petitioner to support his contention that Agent Preston's entry into his house violated his Fourth Amendment rights is Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921). In that case, the Supreme Court found a warrantless search and seizure violated the Fourth Amendment rights of a defendant, where a business acquaintance of the defendant, who was really an undercover government agent, entered the defendant's office on the pretext of making a friendly call and while the defendant was out of the office the agent went through the defendant's personal papers seizing some of them.

The Court in *Gouled* makes it clear that the search and seizure conducted in the absence of the defendant without his consent or a valid warrant was what made the search unlawful, not his method of entry.

In the present case there is no indication that once inside the house Agent Preston ever conducted a search for anything not in plain view while petitioner was absent. Thus, *Gouled* is not applicable here.

■ A third ground for rejecting petitioner's application for relief is that petitioner voluntarily invited Officer Liberti into his house after being informed that Liberti was a narcotics agent. There can be no question but that Liberti's entry into petitioner's home was not made under any ruse or pretext. Once lawfully inside petitioner's house, Officer Liberti's observations were also subject to the plain-sight rule. See Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968); United States v. Cecil, supra, 457 F.2d at 1180; United States v. Williams, 314 F.2d 795 (C.A. 6 1963).

Therefore, the Court is of the opinion that petitioner's application for a Writ of Habeas Corpus must be and the same hereby is denied, and petitioner's application is hereby dismissed.

It is so ordered.